Alright, the next case on calendar for argument is United States Fidelity and Guaranty Company v. Soco West. May it please the court, my name is Paul Banker and I represent the appellant Soco West in this matter. This case involves a spill of perchloroethylene some 33 years ago at the DICE facility outside of Billings, Montana. Let's get out in front of this question and you can review the entire record. There are no witnesses to this spill. There are no documents to document this spill. What you're left with is a combination of some direct evidence, some circumstantial evidence, and the reasonable inferences that can be drawn from that evidence. On appeal, the question here is a rather straightforward question of sufficiency of the evidence, which this court reviews de novo. And on a Rule 50 motion, which is how this case ended, judgment as a matter of law for the insurers, the question is, viewing the evidence in the light most favorable to the non-moving party, and looking at all reasonable inferences that can be drawn, there is enough evidence for a reasonable jury to conclude that it is more likely than not that there was a sudden and accidental spill of perch that resulted in damage by June of 1976. Do you have to meet a substantial probability that this is the way things happened? Pardon me? Do you have to meet a standard of substantial probability that this is the way things could have happened? Well, I think, yes. I mean, it has to be more probable than not that a reasonable jury could believe Soko's evidence that this is how this happened. And in doing that, I think you have to look at both Soko's evidence in support of his theory, as well as the evidence that Soko presented to rebut the other alleged causes. And when you take a look at all of them, and particularly it's interesting in the rule, in the judgment as a matter of law context, because there you are not weighing credibility. You are merely asking, is there any evidence that a reasonable jury could believe? And if a reasonable jury could believe that, then it's a question for the jury to resolve. And, you know, there are all different ways that the case could end. Okay. Well, outline for us all of the best evidence that Soko has. Sure. I think that you begin with the unique chemical signature of the perchloroethylene that's found in the northwest corner. The evidence on that is undisputed, that it did not have the B-tex breakdown compounds that you'd find if it was a mixture of other chemicals that were distributed at the site. You then move to the question of what is down there, that pure perchloroethylene. And the expert testimony, again, undisputed, is that it's 200 to 300 gallons of this pure phase perch. And that it had to have resulted from a surface release in the northwest corner. The second step in this analysis, there was the only place where perchloroethylene was handled in bulk outside of containment was in the unloading area where perch was delivered. And that together with the fact that there was no dumping or discharge in the northwest corner, that together with the fact that from 1976 through at least 1981, there was a ditch outside of containment from the unloading area into the... Did that ditch go all the way to the northwest corner? It's unclear. The ditch led outside of the containment berms along the railroad track towards the northwest corner. The natural drainage of the whole area moved towards the northwest corner. Where the ditch left off exactly, other than that it went along the rail line and outside of the berm, I don't think it's clear from the record. You then move from the question of the ditch and the pathway that was available to the question of, you know, was it a spill? And, again, you have evidence in the record that there was no dumping, that this was a commodity that was being distributed by the company, and a rather expensive chemical in that, the fact that there were policies in place to prevent spills, the fact that there were other kinds of spills of chemicals outside of containment that occurred during transfer, and the fact that the chemical, when PERC was being transferred in the unloading area, was pumped at about 60 gallons per minute. So you then move to the question of what other evidence connects that. That leads us to the discussion about the inventory discrepancy and the testimony of NAF and Halston, NAF being a more specific testimony than Halston, that there was an inventory discrepancy in the fourth quarter of 1975 of a PERC inventory discrepancy in the vicinity of 500 to 600 gallons. They went through that, and they looked at the physical inventory, they looked at the paperwork, they looked to make sure that it wasn't an evaporation loss, they looked to make sure that it wasn't a leak loss, and they also were able to link it together by saying that the inventory PERC that was missing is the same as the PERC that's found in the northwest corner. It's consistent in the amount, and it's also in the time when the pathway existed. So then you move to the next step in the analysis, and you have undisputed testimony that if PERC was released, if PERC moved down to the northwest corner, that it would have caused damage to the groundwater within six months. And last but not least is the question of refuting the alternatives. The insurers argued for several different theories of alternative causes, each of which SOCO had some evidence to refute, the idea that there were discharges from containment. If there had been discharges from containment, there's evidence in the record that that would have been a mixture of chemicals found in the northwest corner. That if it was the dumping of residue from drums, you would have, again, found this chemical soup down in the northwest corner. That if there had been rinsing of barrels that had outside of containment, again, you'd find the chemical soup in the northwest corner. That any small spills that would have occurred, the routine sort of, you know, when you're moving chemical between, you know, unloading it and moving it into a storage area, that was never in a quantity that was sufficient enough to make it to the northwest corner because of the evaporative nature of PERC. That had it been leaking tanks, it would have been a recurring thing that would have wound up in the containment facility, and if it had been discharged from containment, you'd get back to the chemical soup question. And as to the offsite source, that was ruled out by the EPA. So when you take all of that and you're back to the question of, was there enough evidence for a jury to conclude that, for a reasonable jury to conclude that it was more likely than not that there was a sudden and accidental spill that caused damage by June of 1976, I think the answer is yes. Now, this case met its demise rather strangely. I mean, after the close of evidence, the insurers moved for judgment as a matter of law, and at the close of Plano's case and at the close of evidence, it was only after the jury began to deliberate and had been deliberating for some eight hours across two days, they asked a question about special verdict question number three. Now, you know, that isn't in the verdict form, isn't in the record, and that's neither here nor there really because of the posture that this comes in on. But I think the only thing that bears comment there is it isn't clear what the jury's problem was. It isn't clear whether this was something where they were at an impasse and there should have been a mistrial. It isn't clear, and by taking the case and dismissing it on a renewed motion for judgment as a matter of law, rather than any of the other available ways that were available to the district court judge, that is the most favorable standard of review to Soka West. Did anyone ask the judge to consider taking an advisory verdict from the jury? I don't know if that exact language was used. There was a discussion after the question came in with all counsel on the record, and you can see that in the transcript. There was a discussion about what it meant and speculation by the court and by the parties. Soka proposed a stipulation where to say that, you know, if the problem is with a particular, you know, if they're having trouble with a month and a year, then Soka would agree to take the next year so that the question of renewal on a non-calendar basis, which existed for about a three-year period, wouldn't be an issue. There was, Soka was certainly proposing alternatives to the judge about ways to move forward and ways to get past this question from the jury. Can we assume that the jury answered 1 and 2 with a yes? Because they were told not to move on to 3 unless they answered 1 and 2 yes. I mean, that would be my argument. But in all candor, I don't think that the way it is in part of the record. I can't be sure. I mean, that is true that that's the way the verdict form is written. If you can't answer 1, don't go to 2. But I think, you know, there's all sorts of perils with looking into that process and trying to figure out, well, how did the jury find itself on question 3 without having them return a verdict and having that be in the record. Did you answer my question, whether or not anyone proposed to the judge that he get an advisory verdict from the jury? Well, I believe I did by saying I don't know that the word advisory opinion was used in the record. But I think there were several alternatives that were proposed that were in that spirit. But I think the word advisory opinion from the jury was never used in the record. Or advisory verdict. Or advisory verdict. I don't think. Just get the verdict sealed and only open it if required to on appeal or something. Nothing like that was. There was definitely talk about if we don't let the jury finish its process here, we won't have any way to go forward. If this is a mistake to grant judgment as a matter of law, the only way now is to go back and do it all over again. So there was definitely that discussion that was had at the time that became a problem. The judge had expressed, you know, at a number of points in the record, his belief that the evidence in the case was weak. And you can see that in the memorandum opinion on granting judgment as a matter of law. The judge didn't feel that without an eyewitness and without documents of this bill, that it was a strong case. And I think that was an erroneous view of the evidence in the record. I think it is possible to move from both direct and circumstantial evidence and reasonable inferences that a reasonable jury could reach this conclusion. You know, I think, and the most important part of that process, I mean, if you think back, you know, 33 years ago, the fact that there is no witness that steps forward to talk about this or the fact that there is no document doesn't mean that there never was. It means that, you know, standing here today, we haven't found those people and we don't have those people and it's not part of the record. Is it possible that someone observed it? Is it possible that there was a document? I suppose it is, but that isn't the evidence in the case. And so what you're left with is what reasonable inferences can be drawn. If you look at putting a puzzle together and you don't have all of the pieces, you can sometimes see what the picture is of. And that's really what this case is about. Does it come close enough to the preponderance of the evidence standard? And the critical thing there, I think, is the, you know, it would be one thing standing alone to say, well, SOCO has this theory and it makes all the things fit together and it seems plausible. But when you also remove through, you know, through refutation of the other causes, you're left with that is the best theory to explain what happened here. So I think that the, you know, there are any number of ways that the court could have proceeded when faced with this problem. And there would have been ways that are within the court's discretion. There are ways that the court could have shaped it. There are, you know, the court could have sent it back to the jury for additional deliberation with no instruction. It could have sent it back with instructions. But by taking it away and granting judgment as a matter of law, that is the most extreme standard that you're going to be up against. Apparently, the jury was hung up on this having to specify the precise time period. Was that a fair question? Well, I think it would have been a useful question if they could have answered that question. Because there is a period of time, if you look at the coverage chart in the case, that is in the record at page 58 of the excerpt of record. There was a three-year period where the calendar, it wasn't a calendar year renewal from January to January. It was a December 13th renewal. And so once this PERC is damaging the groundwater, once that starts, you know, the law in the Ninth Circuit is that that is a continuing injury that goes forward in time. So once the damage begins to cause, once the PERC begins to cause damage, it's going to trigger every policy after it gets there. The question of when they start, you know, once it became apparent that the jury was having trouble with that question, and they said, you know, if you look at the question that they sent back to the court, we can't come up with a specific answer. I don't know what that means. I mean, could they come up with any answer? Could they come up with a year? Could they come up with a range? We would have needed to know more about that or somehow reach impasse in order to say that there was or was not a basis for proceeding. You know, the jury's role is to find the facts and the court's role is to render judgment. Could the jury have rendered a verdict that would have enabled the judge to enter judgment? I think that they could have. And, you know, the fact of the matter is there's 200 gallons of pure phase PERC down in the northwest corner, which wasn't ñ there's no evidence that anyone put it there other than through an accident, and it continues to cause damage. And it's a question of if it's down there and it caused damage at some point, according to Soka's theory, then there should be some coverage. So the answer is not to toss the case out entirely and say that there's therefore no coverage. The question is more nuanced of exactly when does coverage attach. It has to be a catastrophic spill, though. It can't be a short leak over a period of time. Yeah. When we're talking about the sudden accidental kind of spill, we're not talking about tanks that were leaky. We're talking about an accident. We're talking about something that happens unexpectedly. Right. And once the evidence is clear that the only place outside of containment where this volume of chemicals could have escaped was in the unloading area where the chemical was being transferred at 60 gallons a minute. So it would have been a very short period of time that the chemical could ñ that amount of chemical could be released. Within minutes it would have been down in the northwest corner, at which point it goes into the ground and it's damaging groundwater within six months. But once it's released, there's really no way to put it back into containment. I see that my time is ñ I'd like to reserve the rest of my time for rebuttal if I could. All right. May it please the Court, my name is Robert Johnson. I represent the United States Fidelity and Guarantee Company. I will be presenting the argument on behalf of the appellees today. The other appellee is the Continental Insurance Company, who is represented by Counsel Max Davis at the table with me today. We submit, Your Honors, that Judge Siebel properly granted the appellee's Rule 50A motion because a reasonable jury would not have a legally sufficient basis for which to find for SOCO. Let me initially address a couple of the questions that the panel addressed to my opponent. First of all, no one did ask for an advisory verdict when the question came back from the jury. Secondly, we don't know, we have no idea what the jury was thinking. We have no idea whether the jury had answered questions one and two or whether they had just skipped over them in looking at the entire verdict form to determine. Did the special verdict form say that you weren't to answer three, don't go beyond two if you said no? If you said no to two, then there would be, two was their property damage. If you said no to two, then they would go to the end. If you found that there was property damage, then you would have to establish when the property damage was. The reason for that is that there was no direct evidence as to when this property damage occurred, and it would have to be established as to when this property damage occurred because you had a whole series of insurance policies. I understand that, but can we draw any inferences that they must have answered one and two positively? The flaw on this, Your Honor, the only thing in this entire case that we agree on is that what the jury did is totally legally irrelevant. They say, they acknowledge in their reply brief that what the jury was thinking we'll never know and what the jury was thinking was legally irrelevant in any event with regard to the Rule 50 issue. What the judge did, and the judge explained his thinking in his ruling with regard to his ruling in our favor on the Rule 50 motion, is that he went through his thinking exactly. And he, when the jury came back, he thought back to himself and he said, you know what, I should have granted this Rule 50 when it had been addressed the first time. They had not proved their case. And that is the issue that's before Your Honors. But what would make him change his mind, just thinking some more? Absolutely. I mean, it's interesting because his opinion specifically says, you know, he was giving them the benefit of the doubt. He wanted to let them go to the jury and all of that stuff. But the bottom line is he reconsidered. He said, I've reconsidered. And it's clear to me that they have not proved their case and that no reasonable jury could find in their favor. So let me, dispensing with the issue of what the jury may or may not have been thinking, let me just talk about, let me explain what, why it is the judge was correct in granting the Rule 50 motion. The policies issued by the appellees all contain pollution exclusions. Those exclusions exclude coverage for property damage caused by chemical contamination unless that contamination, unless that contamination was the result of both a sudden and accidental discharge or dispersal of the contaminant into the environment. Now, pursuant to the Montana Supreme Court's decision in Travelers v. Ribby Immunochem Research, Inc., the burden was squarely on Sokol to prove first that a sudden and accidental spill of perc had in fact occurred, second, that the spill had caused property damage, and third, when the property damage occurred. Sokol's entire case, their entire case, is rested on the theory that a one-time sudden and accidental spill of hundreds of gallons of perc occurred in the unloading area and that that somehow got and migrated to the 300 feet, by 300 feet, to the northwest corner. The linchpin of Sokol's theory is that the spill is evidenced by the purported inventory shortage that occurred in the mid-1970s. But there is no evidence, no evidence, direct or circumstantial, which links the inventory shortage to a spill, much less a spill that was both sudden and accidental. The district judge held, because of the lack of such evidence, no reasonable jury could find in Sokol's favor, and therefore he granted our Rule 50A motion. Now, let me explain why the district court's decision was clearly correct, in our opinion. As counsel said, there was no direct evidence at all at trial of the alleged spill. As the district court wrote in his opinion, no witness testified that he caused, witnessed, smelled, or heard about any large spills of perc. Indeed, the undisputed evidence at trial was that when the EPA asked Sokol to conduct an investigation as to how its property became contaminated, Sokol hired counsel who then went out and interviewed 19 current and former Sokol employees, each one of whom, each one of whom denied knowledge of any large spill at the perc facility. Furthermore, Sokol's report to the EPA, which was sworn on oath, noted that many of the individuals interviewed said that if there had been a spill of perc during the unloading process, the perc would have reacted with the asphalt in the unloading area, but none of them, none of them recalled any breakdown of the asphalt in the area, indicating, of course, that no such spill had occurred. Well, we know the stuff arrived at the corner. The burden was on them to establish. They had the burden of proof, Your Honor. I understand that fully, but we can't accept as a fact that there was this large concentration in the northwest corner. You can't. And the question is, how did it get there? How did it get there? And it was their burden to prove it. And they not only had to prove how it got there, but they had to prove that it got there by way of a sudden and accidental spill. Again, the pollution exclusion says we don't cover you for pollution unless it arises out of a sudden and accidental event that causes it. And they don't have evidence of a sudden and accidental event, which is what the court held. Now, he can't. Can you infer from the concentration there that it had to have happened all at once? No, not at all. I don't believe that you have to infer that it happened all at once. Indeed. I don't have to infer, but could one infer? Well, their own witness, their own expert witness said that, well, you know what? It could have been four separate spills. Their own witness said that. Their own expert witness said it could have been four separate spills. And the other thing is that there's no evidence at all as to when it got contaminated. They say that it arises from this inventory shortage in the mid-1970s. But their own expert said that pollution could have gotten there at any point in time in the 1970s or at any point in time in the 1980s. So there is no connection in point of time with regard to when the property got polluted and this so-called inventory shortage. Well, we know when the inventory shortage occurred. Is that correct? Well, there was testimony. It was conflicting between the two people that recalled the inventory shortage. One person said that it was either during the first quarter of 1975, 1976, or 1977. Another witness said, no, he recalled it was in the last quarter of 1975. But the fact of the matter is that they couldn't recall exactly how much was spilled either. One of them recalled that it could have been as low as small. Let me back up. Nobody testified about the spill. They only testified about an inventory shortage. Correct. One of them testified, well, the inventory shortage could have been as little as 87.5 gallons. And the other one testified, well, his recollection was that it was 500 to 600 gallons. What do we know about their access to the records or which records? There are no records, whatever, indicating that there had been a spill. We're talking about the inventory shortage. I'm sorry, there are no records about the inventory shortage. Everything was stuff that was recalled by these two guys 30 years later. Indeed, one of them recalled it only after he read the deposition testimony of the other one. He says that people could be missing. It was his argument, and, gee, it was 30 years ago, and, you know, we can't really put all the pieces together to the puzzle. That's not the case. Do we know, as between those two witnesses, which one was in a position in the company that would make him have knowledge about inventory and the other not, or what do we know about that? Yeah, the one that testified that it could be in any of three different years is the one who was actually in charge of the inventory. He's the one that said it could be as little as 87.5 gallons. Or as high as what? Well, his original testimony, I think, was 200 to 1,000. Let me talk about the witnesses, because they called five current and former employees who were employed at SoCo back in the 1970s when this inventory shortage allegedly occurred. Again, all five of them testified that they never saw a large spill of PERC at the SoCo facility and that they never heard about such a spill from anybody else. These five witnesses included three former employees. Their names are Richard Culver, Delmer Hutchinson, and Charles Bender, who had worked in the yard at the SoCo plant in the 1970s. They were the three people who were charged with loading and unloading chemicals. All three of them denied, under oath, ever seeing a large spill of PERC or hearing about it from others. The other two people that I mentioned that testified were Halston and Nath. They couldn't agree on a lot of things about the inventory shortage, but there was one thing that they agreed on. And what they agreed on is that they had never seen a large spill of PERC at the plant or heard about such a spill from anybody else. And secondly, they agreed that it was never discovered what happened with regard to the inventory shortage, at least as far as they knew. There was, of course, significant evidence at trial about SoCo's chronic problem with inventory shortages. It was undisputed that SoCo's officers and employees believed that such shortages could have been caused by paperwork errors or employee theft. In fact, in a sworn interrogatory answer, SoCo said that there were suspicions that employees may have possibly taken product to be sold or given away. So a spill as opposed to theft or paperwork error was not the only possible explanation as to the inventory shortage. As to the spill theory that they have, it was undisputed that there was no evidence of any physical markers that such a spill had incurred. The evidence was that a spill of hundreds of gallons of PERC would have been a major catastrophic event, leaving certain unmistakable markers in its wake. After all, 500 gallons of PERC weighs four tons, so it can't be quickly or easily disposed of. Indeed, a spill of 500 gallons of PERC would form on a flat surface a diameter of 67 feet. It's a big, big deal. And if the PERC had shot out under pressure from a broken or uncoupled hose, as SoCo postulates in its theory, it would have sprayed all over the unloading area. The loading area where this spill supposedly occurred under SoCo's theory was almost entirely paved with asphalt. The undisputed evidence at trial was that the PERC was a caustic solvent and degrades and dissolves the asphalt on contact. In fact, the Appalachia expert, Dr. Bruce Dale, testified that a spill of hundreds of gallons of PERC would have dissolved the asphalt and left it in a tar-like gooey mess. And that's exactly, exactly what the SoCo employees had told the EPA through the investigation that had been conducted. Its employees said that any large spill of PERC would have degraded the asphalt, but the asphalt was not degraded. That's what they told the EPA. Now, one other thing that I think I should get to is the fact that one of the other inferences in this case is that, well, gee, nobody saw any markers, nobody saw a spill, or maybe somebody's lying about it. That's what the judge said was one of the inferences that he found totally unreasonable. And the reason for that is that the five witnesses that testified at trial, none of them had a reason to lie about it. Four of them are former employees. Each one of them took the stand and said, no, absolutely, positively not, I've never seen a spill of PERC in this amount at the facility. The fifth person is Mr. Halston, who's the inventory shortage guy, and he said, absolutely, positively not, I've never seen a spill of PERC. And he had no reason to lie about it because he wasn't even involved in loading and unloading chemicals. The bottom line on this is that they have not proved, they did not prove their case. Yes, you can draw inferences from evidence, but the bottom line here is that there is an absence of evidence, there is an absence of connection between the so-called inventory shortage and the fact that there is PERC in the northwest corner. The record is replete. Excuse me. Wasn't there some evidence in the record that if there had been a large spill and the people were out there trying to clean it up, that the fumes would kill them? No, there was no evidence in the record of any other spill other than. . . I'm just saying, had there been. . . Oh, had there been evidence in the record. Could you listen to the question? I'm sorry. Wasn't there evidence in the record that this was so caustic and the fumes were so caustic that had there been a spill and a large spill of the kind that is suggested might have occurred, that people would have become sickened? Absolutely. I thought that was in the record. Yes, that is what the record states, and that was a testimony from our expert and it was unrebutted on that point. All right, Counsel, you've exceeded your time. Thank you for your argument. Thank you very much. Rebuttal. There's just one point I'd like to briefly address, and that is this idea of the link between the inventory discrepancy and the material in the northwest corner. I mean, there is evidence in the record to connect those two things. First, you have the fact that it is identical product. It is pure phase perc of the nature that Zoka distributed. Second, it's consistent in amount. The 5 to 600 gallons that's in the record about the inventory discrepancy is consistent with the amount of 2 to 300 gallons that's down in the northwest corner. And third, the 1975 December inventory discrepancy occurs at the one time in the company's history when there was this inconsistency and at the time when there was a pathway to the northwest corner. The fact of the matter is it's down there, and the fact that much of the argument that was addressed here today is a jury argument. But judgment as a matter of law, you take the lay of the land most favorable to Zoka. I'd ask that you reverse and send this case back to the trial court. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Fletcher, Rawlinson, Ezra